IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

MICHAEL LEWIS WILEY      )
    Plaintiff              )
                           )
v.                       )       CASE NO. 1:05-CV-1156-MEF
                           )
LAMAR GLOVER, et al.,    )
    Defendants             )

PLAINTIFF'S SUPPLEMENT
[Pursuant to Rule 15(a) of Federal Rules of Civil Procedure]

*BACKGROUND*

    On September 29, 2005 I was placed into the custody of the Houston County Sheriff's Department, headed by defendant Lamar Glover, in Houston County Jail, supervised by defendant William McCarty.
    I was placed placed in general population for a period of 72 hours. At the end of the 72 hour period, defendant Pamela Miller came to me and asked if I wanted to cut my hair. To which I stated that I couldn't because of my religious beliefs. Defendant Miller then proceeded to place me in disciplinary segregation, where I was to be housed for the next 120 days (indefinitely until my departure from Houston County Jail). Defendant Miller then Proceeded to confiscate my hygiene products and all my legal documents. I received a "disciplinary sanction" within 24 hours. I received no disciplinary hearing or the opprtunity to explain myself to a disciplinary hearing officer (DHO).
    The defendants were informed of the Constitutional violations through a series of grievances and request forms.

*FIRST AMENDMENT*

    "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof..." The initial infringment from which all other violations in this action arise is the violation of my First Amendment right to freedom of religion. I was placed in disciplinary segregation for refusal to comply with unmeritted hair regulations imposed upon me by defendants Glover and McCarty because I stated that such an act would violate my religious customs as  I am

an Orthodox Jew, A Hebrew Israelite. I was subjected to strict scrutiny of the defendants and punished even as a pretrial detainee (see 14th Amend., this document). In regard to the **Religous Freedom Restoration Act (RFRA)** in the case of **Lawson v. Singletary 85 F.3d 502 (11th Cir. 1996)** in which congressional commities charged with consideration of the legislation clearly intended the courts to continue to afford deference to the judgement of prison officials. "The intent of the act is to restore [the] traditonal protection afforded to prisoners' claims prior to O'Lone[**v. Estate of Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)**], not to impose a more rigorous standard than the one that was applied... Accordingly the committee expects that the courts will continue the tradition of giving due difference to the experience and expertise of prison and jail admistrators in establishing necessary regulations and procedures... At the same time however, inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements. S. REP. No. 111, 103d Cong., 1st Sess. 10, U.S.Code Cong. & Admin.News 1993 pp. 1892, 1899. "Therefore, the compelling governmental interest test should be applied to all cases where the exercise of religion is substantially burdened; however, the test should not be construed more stringently or more leniently than it was prior to **Smith**... Prior to 1987, courts evaluated free exercise challenges by prisoners under the compelling governmental interest test. The courts considered the religiously inspired exercise, as well as the difficulty of the prison officals' task of maintaining order and protecting the safety of emplyees, visitors, and inmates." H.R.REP No. 88, 103d Cong., 1st Sess.8; see also 139 CONG.REC.§14362-14365.

[2] The second claim also falls under the First Amendment in that I was denied my right of freedom of speech and to peaceably assemble, in that I was denied any and all telephone access (social or legal) and visitation of my family and friends. In reference to **Pope v. Hightower 101 F.3d 1382 (11th Cir. 1996)** citing **Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987)** "Prison walls do not form a barrier seperating prison inmates from the protection of the Constitution." The **Turner** Court held that when a prison regulation impinges upon an inmate's constitutional rights, it is valid if it is reasonably related

to <u>legitimate penological interests</u> [imphasis added] **Id. @ 89, 107 S.Ct. @2261.**

   **Bell v. Wolfish, 441 U.S. @ 539, 99 S.Ct. @1874** stated that:
> "Legitimate governmental interests include ensuring the detainee's appearance at trial, as well as maintaining security and order at the prison facility."

The "governmental interest" remains to be seen. Women were not made to cut their hair to within one inch from their scalps but instead were required to cut their hair to shoulder length. My Hair is shoulder length. This created a double standard in the regulation. The **Turner** Court identified several factors that serve to channel the reasonableness inquiry: (1) whether there is a "valid rational connection" between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remains open to inmates; (3) whether and the extent to which accomodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an "exaggerated response" to prison concerns **[Pope, 101 F.3d @ 1384]**. Not only does the regulation lack a legitimate governmental interest, but it causes punishments to be imposed upon inmates that also lack legitimacy. Such as the denial of phone and visitation and the prohibiton of writing utencils.

   Whether or not an alternative means of exercising the First Amendment right existed was at stake. When considering this factor, the Supreme Court in **Thornburgh** has instucted that the right must be viewed sensibly and expansively. **Pope citing Thornburgh, 490 U.S. 401, 417, 109 S.Ct. 1874, 1884.** "The right at issue... may be defined expansively as the First Amendment right to communicate with family and friends. The undisputed evidence establishes that **Pope** had alternate means of exercising his right because he could receive visitors and correspond with virtually anyone he wished. The availability of "other avenues" suggests that we should be particularly conscious of the 'measure of judicial deference owed to correctional officials...in gauging the validity of the rugulation.'" **Turner 482 U.S. @ 90, 107 S.Ct. @2262.** I however had no such opportunities to exercise my First Amendment right. At one point in my case I asked that I be allowed to defend myself. It was important that I had frequent contact with my family as they were the only one who could obtain the information I needed for a proper defense. When I was denied contact with my family my only other option was to have a court appointed

Page 3

attorney assigned to my case. Even then my acces to him was cut off by irrational restrictions placed on me by the defendants. When supplies were passed out every week they included paper and envelopes, but oddly enough writing utencils were excluded from those provisions. If I wanted to write anything I had to have another inmate sneak me pens or pencils. Plural because upon "shake down" inspections of my cell (which happened quite often) any writing utencils that were found in my possession were always confiscated. "The right to...send mail is unquestionably protected by the first amendment" **Wolfish v. Levi, 573 F.2d 118, 130 (2d Cir. 1978).** I was also denied the right to purchase mailing stamps for the first 30 days of my incarceration. Even an alternative means of communication while in segregation violated prison policy in some form or fashion. While incarcerated in Houston County Jail I accumulated approximately 18 disciplinary sanctions for minor infractions that never would have occured had I not been unlwfuly placed in segregation in the first place.

### *Fourteenth Amendment*
### Claims

[1] There are also several violations in this action that fall under the fourteenth amendment. The very first and most important of these is the punishment imposed upon myself as a pretrial detainee by the defendants in this action. In **Ingraham v. Wright 430 U.S. 671-672 n 40, 97 S.Ct. @ 1413,** the Supreme Court held that:

> "the State does not aquire the power to punish...until after it has secured a formal adjudication in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment."

Though I was imprisoned in Houston County jail pending 4 charges on September 29, 2005 those procedings were not adjudicated until December 14, 2005 in an Alabama state circuit court. I allege that the state had no "power" to punish me before 12-14-05, and that the defendant's actions did indeed amount to punishment of a pretrail detainee. In **Bell v. Wolfish 441 U.S. @ 535, 99 S.Ct. @ 1872,** the Court held that:

> "[in] evaluating the constitutionality of the conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee."

On the subject of an infraction of a double standard "no hair" policy on the subject of religious beliefs, there was no legitimate governmental interest created insofar as "ensuring the detainee's appearance at trial, as well as maintaining security and order at the prison facility." **Bell v. Wolfish, supra.** Punishment included confinement to my cell for 23 hours a day, no phone calls (legal or personal). No outdoor recreation, no access to law library, no commissary, visitation, and my matress was taken for 12-14 hours a day, everyday.

[2] The second deprivation under this amendment comes in the form of myself being denied a disciplinary hearing in which I could present my views defending my actions. If an inmate has a liberty interest in avoiding segregative confinement, minimum procedures required by due process for placing inmate in such confinement include "some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." **Hewitt 459 U.S. 476, 103 S.Ct. 864;** "although a hearing need not occur prior to confinement in administrative segregation, it must occur within a reasonable time following an inmates transfer" **Hewitt, supra.** U.S.C.A.Const. Amends. 5,14.

As the Court in the case of **Hatch v. D.C., 184 F.3d @ 852** states "we said in **Brown[v. Plaut 131 F.3d 171]** that these requirements are not elaborate, but they are real and must be strictly complied with."

After I received a disciplinary sanction while I was incarcerated in segregation I was never given the chance to express my reasons to a disciplinary hearing officer (DHO). The DHO being Officer Tracy Walker, was never summoned on my behalf. Although I made several attempts at expressing my views.

[3] The third and very important deprivation claim is that I was not afforded reasonable access to the courts which violates the Due Process Clause of the Fourteenth Amendment. While I was was in segregation ALL of my personal belongings were confiscated by prison officials (including defendant Pamela Miller). Among those belongings were Legal documents that were essential to me for pretrial procedings. In the case of **Johnson v. Avery,** the Supreme Court recognized that:

> "it is fundamental that access of prisoners to the courts for the purpose of presenting their complaints [motions] may not be denied or obstructed." **393 U.S. @ 485, 89 S.Ct. @ 749.**

Page 5

The Court held that "unless and until the State provides some reasonable alternative to assist inmates in the preperation of petitions for post-conviction [and pretial motions] relief, it may not validly enforce a regulation..." **Johnson**, 393 U.S. @ 490, 89 S.Ct. @ 751, **Bass v. Singletary** 143 F.3d @ 1444 (11th Cir. 1998). Subsequently, in **Bounds v. Smith**, 430 U.S. 817, 97 S.Ct. 1491, 1492-93, 52 L.Ed.2d 72 (1977) the Court considered "whether States must protect the right of prisoner to access to the courts by providing them with law libraries or alternative sources of legal knowledge." The Court held in the affirmitve "That the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing adequate law libraries or adequate assistanse from persons trained in the law." 430 U.S. @ 828, 97 S.Ct. @ 1498.

It is true that I was denied acces to a law library, as are all inmates in segregation in Houston County Jail, but this ruling in **Bounds and Johnson should also** be applied to an inmate's personal adequacy in his own property as well. And that while the plaintiffs in the above cited cases brought their complaint's regarding post conviction, these violations should be held in a more serious light in dealing with pretrial situations. In **Bass v. Singletary, supra,** both **Johnson** and **Bounds were** determined to have the same essence in that inmates were denied the right of access to courts. As the Supreme Court recognized in **Bounds, Johnson** applied "[e]ssentially the same standards of access...", 430 U.S. @ 823, that the Court applied in previous decisions.

**Lewis v. Casey** 518 U.S. 343,116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) the Court held that a plaintiff must show injury before seeking relief according to **Bounds**. At the result of this stream of violations caused by the defendants, I was I was not able to adequately combat my pending charges, and as the result I was sentenced to 20 years in an Alabama State penitintiary and restitution fees. I also sustained physical injuries due to having to sit and sleep on steel in a room without a blanket during the fall and winter months.

Relief is sought in nominal and punitive damages. I am suing the defendants both inside and outside the scope of employment because "[a] necessary concomitant to the determination of whether the constitutional right is 'clearly established' at the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional

right at all." **Cottrell v. Caldwell 85 F.3d 1480 (11th Cir. 1996)** quoting **Siegert, 500 U.S. @ 232, 111 S.Ct. @ 1793.** As stated before, the defendants were notified of their unconstitutional acts before civil action was brought against them. [See Attached].

Dated: 10-5-06

**Respectfully Submitted,**

*Michael Wiley*

MICHAEL WILEY
Plaintiff

# INMATE GRIEVANCE FORM

DATE: 11-09-_____, 2005   POD/CELL LOCATION: B-10

INMATE NAME: Michael Wiley   INMATE NUMBER: 54722

NATURE OF GRIEVANCE OR INFORMATION: I am being held back here in segregation and I can't contact anybody and my papers are being kept from me. Papers I need in my upcoming cases. Keeping them from me is a violation of my 5th and 14th Amendment Rights. I NEED those papers!

WHAT DO YOU WANT TO HAPPEN TO SOLVE IT? I would like for my papers to be returned to me so that I can defend myself in court.

OFFICER RESPONSE OR FINDING?

SGT. ON DUTY RESPONSE:

* * * * * * * * * * * * * * *  DO NOT SIGN UNTIL YOU HAVE READ RESPONSE  * * * * * * * * * * * * * * *

DATE GRIEVANCE RETURNED:

CORRECTIONS OFFICER SIGNATURE: Sopp

INMATE SIGNATURE:

<u>CERTIFICATE OF SERVICE</u>

<u>Date</u>:

Re: CIVIL ACTION No.: 1:05-CV-1156-MEF

I, MICHAEL LEWIS WILEY, Plaintiff in the above mentioned cause, hereby certify that a copy of the plaintiff's **MOTION TO SUPPLIMENT** and **SUPPLEMENT** has been sent to the defendant's counsel at SHERRER, JONES & TERRY, P.C. 335 West Main Street, P.O. Box 805 Dothan Alabama 36302 via the United States Postal Service, certified prepaid postage on this 5th day of October 2006.

MICHAEL LEWIS WILEY
Plaintiff