IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MICHAEL LEWIS WILEY,<br>Federal Reg. #11314-002, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:05-CV-1156-MEF |
| | ) | [WO] |
| | ) | |
| SHERIFF LAMAR GLOVER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

### I. INTRODUCTION

This case is pending before the court on a 42 U.S.C. § 1983 complaint and amendment thereto filed by Michael Lewis Wiley ["Wiley"], a federal inmate, in which he alleges constitutional violations related to his previous confinement in the Houston County Jail. In this cause of action, Wiley, an Orthodox Jew/Hebrew Israelite, contends the defendants (i) violated his First Amendment right to freedom of religion, subjected him to cruel and unusual punishment and deprived him of due process by placing him in segregation for refusing to cut his hair, (ii) violated his right to equal protection by subjecting him to a different hair length restriction than the restriction applied to female inmates, (iii) failed to provide him a nutritionally adequate diet, (iv) failed to provide him medical assistance for his alleged physical deterioration, (v) deprived him of the right to

communicate with his family and friends via mail, telephone and visitation, (vi) subjected him to cruel and unusual punishment by denying him adequate exercise opportunities and removing his mattress during the day, (vii) denied him the right to practice his religion, and (vii) denied him access to the courts. Wiley names Lamar Glover, the sheriff of Houston County, Alabama, William B. McCarty, commander of operations at the Houston County Jail, Pamela Miller, a jail correctional officer, Carolyn Deloris Jackson, food service director at the jail, Darla Jane Speigner, a certified registered nurse practitioner employed by the jail, and unidentified Houston County Jail staff as defendants in this cause of action.[1] Wiley seeks monetary damages for the alleged violations of his constitutional rights.

The defendants filed a special report, supplemental special report and supporting evidentiary materials addressing Wiley's claims for relief. Pursuant to the orders entered in this case, the court deems it appropriate to treat these reports as a motion for summary judgment. *Order of February 10, 2006 - Court Doc. No. 15*; *Order of December 21, 2006 - Court Doc. No. 33*. Thus, this case is now pending on the aforementioned motion for summary judgment. Upon consideration of such motion, the evidentiary materials filed in support thereof, and the plaintiff's response in opposition to this motion, the court concludes that the defendants' motion for summary judgment is due to be granted.

---

[1]The defendants held the identified positions at the time of the actions which form the basis for the instant complaint.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir.2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule 56(c), as amended December 1, 2007, (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.").[2]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate

---

[2]Effective December 1, 2007, "[t]he language of Rule 56 [was] amended ... to make the rule[] more easily understood and to make style and terminology consistent throughout the rules.  These changes ... are stylistic only."  Fed.R.Civ.P. 56 Advisory Committee Notes.  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing the prior rule remain equally applicable to the current rule.

burden of proof.  *Id.* at 322-324.

The defendants have met their evidentiary burden.  Thus, the burden shifts to Wiley

to establish, with evidence beyond the pleadings, that a genuine issue material to each of

his claims for relief exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991);

*Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(2) ("When a motion for summary judgment

is properly made and supported, an opposing party may not rely merely on allegations or

denials in its own pleading; rather, its response must ... set out specific facts showing a

genuine issue for trial.").  A genuine issue of material fact exists when the nonmoving party

produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.

*Greenberg*, 498 F.3d at 1263.

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of
> professional judgment.  In respect to the latter, our inferences must accord
> deference to the views of prison authorities.  Unless a prisoner can point to
> sufficient evidence regarding such issues of judgment to allow him to prevail
> on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, ---, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (citation

omitted).  Consequently, to survive the properly supported motion for summary judgment

filed in this case, Wiley is required to produce "sufficient evidence" which would be

admissible at trial supporting his claims of various constitutional violations.  *Id.*; *Anderson

v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence [on which the

nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Id*. at 249-250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (plaintiff's "conclusory assertions ..., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."). Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (if on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine issue of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to

admissible form indicates that there is no genuine issue of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (to establish a genuine issue of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine issue of material fact. *Beard*, 548 U.S. at ---, 126 S.Ct. at 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, a plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. In this case, Wiley has failed to demonstrate requisite genuine issues of material fact so as to preclude summary judgment. Specifically, Wiley presents no evidence, sufficiently probative or otherwise, to support of his allegations regarding constitutional violations during his confinement at the Houston County Jail. *Matsushita*, *supra*.

7

# III.  DISCUSSION[3]

## A.  Jail Staff

The plaintiff lists "Houston Co. Jail Staff " as a defendant.  *Plaintiff's Complaint - Court Doc. No. 1* at 1.  This designation  fails to properly name a defendant as required by the applicable federal rule.  *See* Rule 10(a), *Federal Rules of Civil Procedure* (title of the complaint must include the names of all parties); *New v. Sports and Recreation, Inc.*, 114 F.3d 1092, 1094 at n.1 (11th Cir. 1997) (fictitious party practice not permitted in federal court).  Moreover, without proper identification of an individual as a party, the individual is not on adequate notice that a claim has been lodged against him or her.  The claims against unidentified staff of the Houston County Jail are therefore due to be dismissed.

---

[3]The actions which form the basis of the instant complaint occurred ***after*** Wiley's felony convictions before this court for interference with commerce by threat or violence in violation of 18 U.S.C. § 1951 and carrying a firearm in commission of a crime in violation of 18 U.S.C. § 924(c).  *Defendants' Exhibit D to the Initial Affidavit of William B. McCarty - Court Doc. No. 14-11* at 30-31.  Houston County officials obtained custody of Wiley on September 29, 2005 and transferred him from federal custody to the Houston County Jail for disposition of several felony charges pending against him before the Circuit Court of Houston County, Alabama.  The state court imposed felony convictions upon Wiley on December 14, 2005 and returned him to federal custody shortly after imposition of these convictions.  It is therefore clear that the actions about which Wiley complains relate to incidents which happened during his status as a convicted felon.  Nevertheless, regardless of his status, the applicable standard of review remains the same.  *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861 (1979); *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997); *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996) (citations omitted) ("Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners....  However, the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir. 1985), *cert. denied*, 475 U.S. 1096, 106 S.Ct. 1492 (1986) (For analytical purposes, there is no meaningful difference between the analysis required by the Fourteenth Amendment and that required by the Eighth Amendment.); *Tittle v. Jefferson County Commission*, 10 F.3d 1535, 1539 (11th Cir. 1994) (observing that "[w]hether the alleged violation is reviewed under the Eighth or Fourteenth Amendment is immaterial.").

## B. Absolute Immunity

To the extent Wiley sues the named defendants in their official capacities, they are immune from monetary damages. Official capacity lawsuits are "in all respects other than name, ... treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). Under all facets of Alabama law, a county sheriff, his jailers and medical staff act as state officers "when supervising inmates and otherwise operating the county jails." *Turquitt v. Jefferson County, Alabama*, 137 F.3d 1285, 1289 (11th Cir. 1998); *see* Ala. Const. Art. V, § 112 (designates sheriff as member of State's executive department); *see also Parker v. Amerson*, 519 So.2d 442 (Ala. 1987) (county sheriff is executive officer of the State). "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, it is clear that the defendants are state officials entitled to

9

Eleventh Amendment immunity when sued in their official capacities. Thus, the defendants are entitled to absolute immunity from the plaintiff's claims for monetary damages asserted against them in their official capacities.

## C.  Challenges to Hair Length Policy

1. <u>First Amendment Claim</u>.  Upon defendant's entry into the Houston County Jail, correctional officials advised Wiley that the length of his hair violated the jail's hygiene policy and cautioned Wiley that failure to cut his hair in accordance with the policy would result in his placement in segregation.[4]  Wiley refused to cut his hair, stating that "he couldn't because of his religious beliefs." *Plaintiff's Amendment to the Complaint - Court Doc. No. 22* at 1.  At this time, correctional personnel placed Wiley in the jail's general population, allowing him three days to consider acquiescing with the policy and submitting to a hair cut.  Upon expiration of these three days, Wiley again refused to cut his hair and defendant Miller, in compliance with standing orders, transported the plaintiff to segregation for his refusal.  Wiley unsuccessfully appealed the decision to place him in segregation and he remained in segregation throughout his confinement in the Houston County Jail due to his continued refusal to undergo a haircut.

---

[4]The applicable policy reads as follows: "In order to promote the institutional goals of **health, cleanliness, safety and security** in the Houston County Jail, it is the policy of the Houston County Jail that ... all inmates, male and female, shall adhere to this policy.  Male inmates shall have hair no longer than one inch from their scalp. Additionally, female inmates shall have hair no longer than collar length.  There will be no special hairstyles permitted.  Furthermore, there shall be no facial hair greater than one-quarter inch (1/4") in length and fingernails shall be clipped to the tip of the finger...."  *Defendants' Exhibit A to the Initial Affidavit of William B. McCarty - Court Doc. No. 14-8* at 10 (emphasis added).

Wiley identifies himself as an Orthodox Jew/Hebrew Israelite. Wiley asserts the wearing of long hair is significant to his religious beliefs and that the jail's ban on long hair therefore violates his right to the free exercise of his religion arising under the First Amendment. The defendants argue that seeking or requiring adherence to the grooming policy does not result in the violation of an inmate's constitutional rights as the challenged policy advances the legitimate penological interests of promoting inmate health and hygiene and maintaining safety and security within the jail.

Federal law recognizes "that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' [*Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807 (1974)]. As the *Martinez* Court acknowledged, 'the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.' *Id.*, at 404-405, 94 S.Ct., at 1807. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources...." *Turner v. Safley*, 482 U.S. 78, 84-85, 107 S.Ct. 2254, 2259 (1987). Correctional officials are therefore "accorded latitude in the administration of prison affairs[,]" *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081 (1972), which necessarily includes "the [inescapable] withdrawal or limitation of many [inmate] privileges and rights." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974) (quotation marks and citation omitted); *Bell v. Wolfish,* 441 U.S. 520, 546, 99 S.Ct. 1861,

11

1877 (1979). The principle limiting the constitutional rights retained by inmates "applies equally to pretrial detainees and convicted prisoners. A detainee simply does not possess the full range of freedoms of an unincarcerated individual." *Bell*, 441 U.S. at 546, 99 S.Ct. at 1878.

"In the First Amendment context, ... some rights are simply inconsistent with the status of a prisoner or 'with the legitimate penological objectives of the corrections system.'" *Shaw v. Murphy*, 532 U.S. 223, 229, 121 S.Ct. 1475, 1479 (2001), quoting *Pell*, 417 U.S. at 822, 94 S.Ct. at 2804. In accordance with this principle, an inmate's rights established under the First Amendment are not protected if allowing such protection is "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell*, 417 U.S. at 822, 924 S.Ct. at 2804. Thus, while inmates retain a constitutional right protected by the First Amendment to exercise freely their sincerely held religious beliefs, this right is limited by the fact of incarceration and valid penological objectives such as maintaining institutional security and order. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 345 (1987); *Lawson v. Singletary*, 85 F.3d 502, 521 (11th Cir. 1996). The law is well settled that "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell*, 417 U.S. at 823, 94 S.Ct. at 2804; *Bell v. Wolfish,* 441 U.S. at 546, 99 S.Ct. at 1878 ("[M]aintaining institutional security and preserving internal order and discipline are

essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees."). It is therefore clear that preservation of security and order within a jail is essential to the facility's effective administration and constitutes both a compelling and substantial governmental interest. *Pell*, 417 U.S. at 823, 94 S.Ct. at 2804; *Lawson*, 85 F.3d at 512; *Harris v. Chapman*, 97 F.3d 499, 504 (11th Cir. 1996).

In a prison setting, to demonstrate a free exercise violation, a plaintiff must show that prison officials administered or implemented a policy or regulation, not reasonably related to any legitimate penological interest or security measure, which burdens the practice of his religion or restricts his free exercise of a sincerely held religious belief. *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989); *O'Lone*, 482 U.S. at 349; *see also Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). The burden must be substantial and significantly interfere with an inmate's practice of his religious beliefs. *Hernandez*, 490 U.S. at 699. A policy is "valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89; *O'Lone*, 482 U.S. at 349. "[S]uch a standard is necessary if 'prison administrators ..., and not the courts [are] to make the difficult judgments concerning institutional operations.'" *Turner*, 482 U.S. at 89 (quoting *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 128, 97 S.Ct. 2532, 2539 (1977)). Consequently, the defendants do not have the burden of proving the validity of its jail

regulation; rather, the burden is on the plaintiff to disprove it. *Id*. at 89-91.

In determining whether a prison regulation improperly infringes on a prisoner's constitutional rights, the factors to be considered include: (1) whether there is a valid, rational relationship between the regulation and the legitimate government interest it serves; (2) whether there are alternative means of exercising the right available to the inmates; (3) the impact accommodation of the asserted right will have on jail staff and other inmates; and (4) the absence of ready alternatives as evidence of reasonableness of the regulation. *Turner*, 482 U.S. at 89-91; *Beard*, 548 U.S. at ---, 126 S.Ct. at 2578. However, a "court is not required to weigh evenly, or even consider explicitly, each of the four *Turner* factors." *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999); *Freeman v. Texas Department of Criminal Justice,* 369 F.3d 854, 860 (5th Cir. 2004) (interpreting the decision in *Turner* as stating that a court need not weigh evenly or even consider each of the factors as rationality is the controlling standard).

The stated purpose of the jail's hygiene policy is maintenance of safety and security in the jail and provision of a clean and healthy environment. Correctional grooming policies have repeatedly been upheld by federal courts, including the Eleventh Circuit Court of Appeals, in the face of challenges under the Free Exercise Clause of the First Amendment as reasonably related to legitimate penological interests of maintaining security and promoting cleanliness. *Harris v. Chapman*, 97 F.3d 499, 504 (11th Cir. 1996),

*cert. denied*, 520 U.S. 1257, 117 S.Ct. 2422 (1997).  In *Harris*, the Eleventh Circuit acknowledged "a compelling State interest in issues relating to the security of prison facilities and related issues, such as the ability to identify prisoners, to be able to prevent [prisoners] from disguising themselves and from secreting objects in their hair and so forth...." 97 F.3d at 504.  The Court therefore upheld a prison hair length regulation under the First Amendment and even more rigorous least restrictive means standard because correctional officials "have a compelling interest in security and order" and the challenged regulation constituted "least restrictive means" of satisfying these interests. *Id.*; *Martinelli v. Dugger*, 817 F.2d 1499, 1506-1507 (11th Cir. 1987), *cert. denied*, 484 U.S. 1012, 108 S.Ct. 714 (1988), *abrogated on other grounds*, *Harris v. Chapman*, 97 F.3d 499 (11th Cir. 1996) (prison hair length rule virtually identical to rule addressed in *Harris* upheld as constitutional because rule was least restrictive means of advancing substantial government interests in maintaining prison security and identifying escapees); *Shabazz v. Barnauskus*, 790 F.2d 1536, 1540 (11th Cir.), *cert. denied*, 479 U.S. 1011, 107 S.Ct. 655 (1986) (affirming decision of district court that regulation prohibiting beards on inmates "serve[s] a legitimate penological interest in preventing escape" and constitutes the least restrictive alternative available); *Longoria v. Dretke*, 507 f.3d 898, 901 (5th Cir. 2007) (grooming policy which prohibited male inmates from growing long hair does not violate the Free Exercise Clause); *Gooden v. Crain*, 389 F.Supp.2d 722, 725 (E. D. Tex. 2005) ("[A]ny

challenge to the prison system's grooming policy based on the Free Exercise Clause is frivolous."); *Green v. Polunsky*, 229 F.3d 486 (5th Cir. 2000) (prison grooming policy requiring inmates to keep their hair cut short and faces clean shaven reasonably related to legitimate penological interests and therefore did not deprive inmate free expression of religion under the First Amendment); *Diaz v. Collins*, 872 F.Supp. 353, 358-359 (E.D. Tex. 1994) (security concerns constitute compelling governmental interests in requiring inmates to cut their hair and grooming regulation is least restrictive means to achieve these interests); *Powell v. Estelle*, 959 F.2d 22, 26 (5th Cir.), *cert. denied*, 113 S.Ct. 668 (1992) (correctional facility's prohibition on long hair deemed valid as policy "is rationally related to legitimate state objectives."); *Thunderhorse v. Pierce*, 418 F.Supp.2d 875, 895 (E.D. Tex 2006) (prison regulation governing hair length did not violate Native American inmate's free exercise rights); *Henderson v. Terhune*, 379 F.3d 709, 715 (9th Cir. 2004) (prison regulation prohibiting hair longer than three inches did not unconstitutionally restrict inmate's right to free exercise of Native American religion as the "hair length regulation is reasonably related to legitimate penological interests[]" including maintaining security in the prison and promoting prisoner hygiene); *Hines v. South Carolina Department of Corrections*, 148 F.3d 353, 358 (4th Cir. 1998) (grooming policy "enacted to suppress contraband, limit gang activity, maintain discipline and security, and prevent inmates from quickly changing their appearance" did not run afoul of the Free Exercise Clause of the

First Amendment as policy was based on "legitimate - indeed, compelling - governmental and penological interests" of maintaining order, discipline and safety); *Hamilton v. Schriro*, 74 F.3d 1545, 1551 (8th Cir. 1996) (hair length regulation did not violate Native American prisoner's constitutionally guaranteed right to free exercise of religion); *Campbell v. Purkett*, 957 F.2d 535, 537 (8th Cir. 1992) (finding prison hair length rule applicable to follower of Nazarite religion constitutional); *Iron Eyes v. Henry*, 907 F.2d 810, 814-816 (8th Cir. 1990) (prison regulation prohibiting hair longer than base of shirt collar did not run afoul of the Free Exercise Clause as regulation was reasonably related to legitimate penological interests); *Phipps v. Parker*, 879 F.Supp. 734, 736 (W.D. Ky. 1995) (prison hair length rule did not violate First Amendment rights of Orthodox Hasidic Jew inmate because rule advanced compelling government interests in maintaining prison safety, providing quick identification of inmates and promoting sanitation and satisfied requirement for implementation of least restrictive means); *Hall v. Bellmon*, 935 F.2d 1106, 1114 (10th Cir. 1991) (prison intake policy of cutting inmates' hair does not violate free exercise of religion as policy relates to legitimate penological interest of preventing inmates from hiding weapons in their hair).  In light of the foregoing, the court concludes the defendants are entitled to summary judgment on the plaintiff's claim challenging the hygiene policy as a violation of his right to the free exercise of religion under the First Amendment.

2. <u>Cruel and Unusual Punishment</u>.  Wiley asserts that implementation of a policy requiring short hair for inmates constitutes cruel and unusual punishment in violation of the Eighth Amendment.  This claim is without merit.

Jail officials have established that they instituted the hygiene policy, in part, because of safety and security concerns.  The fact that inmates who refuse to comply with the policy are placed in segregation does not alter the fact that the policy is a "safety and security" measure.  *Solomon v. Zant*, 888 F.2d 1579, 1582 (11th Cir. 1989).  As previously noted, "the legitimate government interest in the order and security of penal institutions justifies the imposition of certain restraints."  *Procunier*, 416 U.S. at 412-413, 945 S.Ct. at 1811.  Consequently, enforcement of a valid security regulation "is not punishment for the purposes of an inmate's right to due process....  After finding that institutions can require that ... inmates [have short hair], it is reasonable to conclude that compliance with the policy will not result in a constitutional violation." *Solomon*, 888 F.2d at 1582.  Moreover, the defendants did not force Wiley to cut his hair in accordance with the policy and there is no evidence before the court that the challenged policy resulted in the unnecessary and wanton infliction of pain prohibited by the Eighth Amendment.  *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 2323 (1991); *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977 (1994); *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1976).  The defendants are therefore entitled to summary judgment on this challenge to the grooming

18

policy.

3. <u>Denial of Due Process</u>.  Upon his entry into the Houston County Jail, jail personnel advised Wiley of the regulation governing hair length and advised him of the need to cut his hair in compliance with the regulation. Wiley told jail personnel that he would not cut his hair due to his religious beliefs.  Officials placed Wiley in the jail's general population and apprised Wiley that he had three days to comply with the grooming policy.  They also advised Wiley that failure to comply with the grooming policy would result in his placement in segregation.  At the expiration of this time period, jail personnel repeated their request that Wiley comply with the hair length policy and Wiley again refused to comply with the policy based on his religious beliefs.  Officials then placed Wiley in segregation due to his refusal to conform with the hair length regulation.  It is undisputed that at any time after his placement in segregation "the plaintiff could have gotten himself out of segregation merely by complying with the hygiene policy of the jail and agreeing to permit his hair to be cut as required by the policy." *Defendants' Exhibit 4/Initial Affidavit of William B. McCarty - Court Doc. No. 14-7* at 3.

Wiley complains his placement in segregation for failure to comply with the jail's hygiene policy violated his right to due process as he did not receive a formal disciplinary hearing prior to such placement.  The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no state "shall deprive any person of life,

liberty, or property without due process of law." Thus, the Constitution is implicated only if a person is deprived of an interest which is in some way protected by the Due Process Clause. In sum, absent the existence of a protected interest, there can be no procedural due process violation. *Sandin v. Conner*, 515 U.S. 472, 478, 115 S.Ct. 2293, 2297 (1995) ("[T]he Due Process Clause does not protect every change in the conditions of confinement having a substantial impact on the prisoner.").

The Supreme Court has identified two circumstances in which a prisoner, an individual already deprived of his liberty in the ordinary sense, can be further deprived of his liberty such that due process is required. "The first is when a change in a prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court. *See Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995); *see, e.g.*, *Vitek v. Jones*, 445 U.S. 480, 492-93, 100 S.Ct. 1254, 1263-64, 63 L.Ed.2d 552 (1980) (holding that a prisoner is entitled to due process prior to being transferred to a mental hospital). The second is when the state has consistently given a certain benefit to prisoners (for instance, via statute or administrative policy), and the deprivation of that benefit 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' *Sandin*, 515 U.S. at 484, 115 S.Ct. at 2300; *see, e.g.*, *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974) (prisoners may not be deprived of statutory 'good-time credits' without due

process); *cf. Dudley v. Stewart*, 724 F.2d 1493, 1497-98 (11th Cir.1984) (explaining how the state creates liberty interests). In the first situation, the liberty interest exists apart from the state; in the second situation, the liberty interest is created by the state." *Bass v. Perrin*, 170 F.3d 1312, 1318 (11th Cir. 1999).

The Constitution itself does not give rise to a liberty interest in avoiding transfer to more burdensome conditions of confinement. *Meachum v. Fano,* 427 U.S. 215, 225 (1976) (no liberty interest arising from Due Process Clause itself in transfer from low-to maximum-security prison because "[c]onfinement in any ... institution[] is within the normal limits or range of custody which the conviction has authorized the [custodial entity] to impose"); *Olim v. Wakinekona*, 461 U.S. 238, 245-246 (1983) (a prisoner has no constitutional right to be confined in a particular institution and may be subjected to an interstate transfer without implicating the Constitution). Moreover, an inmate has no constitutionally protected interest in the procedure affecting his classification level, the privileges bestowed upon him or confinement in the least restrictive prison environment because the resulting restraints are not so severe that they exceed the sentence imposed upon him. *Sandin*, 515 U.S. at 485, 115 S.Ct. at 2301 ("Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law."). Thus, the deprivations imposed upon Wiley did not "exceed the sentence [imposed by this court in 2004 for his federal convictions] in such an

21

unexpected manner as to give rise to protection by the Due Process Clause of its own force." *Sandin,* 515 U.S. at 484, 115 S.Ct. at 2300. This court must therefore determine whether the actions about which Wiley complains involve the deprivation of a state-created liberty interest as defined by the standard set forth in *Sandin*.

As the Supreme Court noted,

> *Sandin* involved prisoners' claims to procedural due process protection before placement in segregated confinement for 30 days, imposed as discipline for disruptive behavior. *Sandin* observed that some of our earlier cases, *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), in particular, had employed a methodology for identifying state-created liberty interests that emphasized "the language of a particular [prison] regulation" instead of "the nature of the deprivation." *Sandin*, 515 U.S., at 481, 115 S.Ct. 2293. In *Sandin*, we criticized this methodology as creating a disincentive for States to promulgate procedures for prison management, and as involving the federal courts in the day-to-day management of prisons. *Id.*, at 482-483, 115 S.Ct. 2293. For these reasons, we abrogated the methodology of parsing the language of particular regulations.
>
> "[T]he search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause. The time has come to return to the due process principles we believe were correctly established in and applied in *Wolff* and *Meachum.* Following *Wolff*, we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will generally be limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*, at 483-484, 115 S.Ct. 2293 (citations and footnote omitted).
>
> After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves "in relation to the

ordinary incidents of prison life." *Id.*, at 484, 115 S.Ct. 2293.

*Wilkinson v. Austin*, 545 U.S. 209, 222-223, 125 S.Ct. 2384, 2393-2394 (2005).

Applying the *Sandin* standard, the court concludes that the loss of privileges and confinement in segregation "though concededly punitive, do[] not represent a dramatic departure from the basic conditions" of the sentence imposed upon the plaintiff. *Id.* at 485; *Hewitt*, 459 U.S. at 468, 103 S.Ct. at 869 (segregation and the inability to participate in programs with the general population are common incidents of prison life "well within the terms of confinement ordinarily contemplated by a prison sentence."); *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (where segregation entailed housing in extremely harsh conditions, placed severe limits on out of cell time and allowed no access to educational or religious services, no atypical and significant hardship occurred).  In light of the foregoing, it is clear that the sanctions placed on Wiley failed to "impose[] atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Id.* at 484. Consequently, the plaintiff's theory of liability under the law as established in *Sandin* is without merit, and summary judgment is due to be granted in favor of the defendants on any potential due process claim.[5]

---

[5]The court further finds that the process provided to Wiley prior to his placement in segregation for penological reasons comported with the requirements of due process mandated by the Constitution.  *Hewitt*, 459 U.S. at 476-477 (requiring some notice to inmate of reason for adverse action and an opportunity for him to express views); *Goldberg v. Kelly*, 397 U.S. 254 (1970) (the fundamental requisite of due process is the opportunity to be heard); *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding ... is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an

4. <u>Equal Protection</u>.  Wiley asserts the differing standards of hair length for male and female inmates "created a double standard in the regulation."  *Plaintiff's Amendment to the Compliant - Court Doc. No. 22* at 3.  To the extent this assertion can be construed as a claim arising under the Equal Protection Clause, Wiley is entitled to no relief.  Disparate hair regulations for male and female inmates have consistently survived equal protection challenges.  *Hill v. Estelle*, 537 F.2d 214, 215-216 (5th Cir. 1976) (footnotes omitted) (difference in application of hair length and other regulations "based on sex is [not] a constitutional violation of equal protection....  The regulations impinge on no fundamental right and create no suspect classification.  The disparity between the regulations for male and female inmates is not so grievous as to make them arbitrary or unreasonable, cruel or unusual, and the wisdom of the disparate regulations will be left to the judgment of [custodial] penologists.");[6] *Longoria v. Dretke*, 507 F.3d. 898, 904-904 (5th Cir. 2007) (equal protection claim based on differing grooming regulations for male and

---

opportunity to present their objections.").  As previously discussed herein, the Constitution does not require that all internal classification/disciplinary decisions comport with each of the procedural safeguards set forth in *Wolff v. McDonnell*, 418 U.S. 539 (1974).  *Sandin*, *supra*.  Jail officials provided Wiley notice of the grooming policy and advised him that failure to comply with such policy would subsequently result in his placement in segregation. They also provided Wiley opportunities to be heard on this matter. *Plaintiff's Affidavit in Response - Court Doc. No. 34* at 2.  Nothing more is required by the Constitution.  It is therefore clear that Wiley received all the process to which he was due prior to his placement in segregation.

[6]The decision issued in *Hill* is binding precedent for this court.  *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) ("We hold that the decisions of the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth'), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit.").

24

female inmates "is without merit."); *Diaz v. Collins*, 872 F.Supp. 353, 359 (E.D. Tex. 1994) (same); *Fegans v. Norris*, --- F.3d ----, 2008 WL 3266653 *6 (8th Cir. 2008) (different security concerns presented by male and female inmates provide sufficient basis for disparate hair length rules and such rules did not violate plaintiff's constitutional right to equal protection); *Campbell v. Purkett*, 957 F.2d 535, 537 (8th Cir. 1992) (grooming regulation forbidding long hair for male inmates survives an equal protection challenge because regulation is reasonably related to penological interests); *Pollock v. Marshall*, 845 F.2d 656, 659-660 (6th Cir. 1988) (hair length restrictions that differ for male and female prisoners are legitimate in furthering prison security and do not violate an inmate's equal protection rights); *Dreibelbis v. Marks*, 742 F.2d 792, 795-796 (3rd Cir. 1984) (differing hair length standards for men and women prisoners do not violate equal protection because the standards "rest[] on real and substantial differences" among men and women); *McClelland v. Sheriff's Deputy*, 2001 WL 34826228 *8-*9 (E.D. Va. 2001) (differing hair length standards for male and female inmates who inherently pose disproportionate security concerns did not violate Equal Protection Clause).

### D.  Food Servings

Upon entry into the Houston County Jail, Wiley requested a Kosher diet so that he would not be served meals containing beef, pork or byproducts of these meats.  The undisputed evidentiary materials filed by the parties demonstrate that the defendants

adhered to Wiley's request and served him Kosher meals.  Wiley, however, maintains the Kosher diet provided by the defendants failed to constitute a nutritionally adequate diet and caused him to suffer from malnourishment.  *Plaintiff's Complaint - Court Doc. No. 1* at 3. The defendants deny these allegations and present various evidentiary materials, including affidavits, menus identifying the food served during each four-week cycle at the Houston County Jail and a Statement of Nutritional Adequacy for the menu plan of the jail.  "**The daily average calorie count for the [Houston County Jail] menu exceeds 3000**.... [T]he menus [of the Houston County Jail] meet R.D.A.'s [or Recommended Daily Allowances] for all major nutrients....  The allowances are set at a higher level than to just maintain good nutrition in healthy persons.  An intake of at least two-thirds of the R.D.A. level is considered adequate for most healthy humans."  *Defendants' Exhibit A to the Affidavit of Carolyn Deloris Jackson - Court Doc. No. 14-5 (April 13, 2005 Statement of Nutritional Adequacy).*  Defendant Jackson, food service director for the jail, addresses Wiley's dietary claims as follows:

> .... The plaintiff requested food without pork or beef.  The plaintiff's request was ... noted and implemented.
> As Food Service Director, I see that all inmates in the Houston County Jail are served a proper diet intended to meet all nutritional requirements.  All menus for meals in the Houston County Jail are reviewed by a licensed dietician.  Jail menus provide on average 3,000 calories per day with adequate nutrients according to standards set by Food and Nutrition Board of the National Academy of Science....  My staff and I prepare hot foods for the vast majority of meals and attempt to preserve heat by covering the trays.
> ***

At all times complained of by the plaintiff, the plaintiff was served meals with an average of 3,000 calories per day with adequate nutrients according to standards set by Food and Nutrition Board of the National Academy of Science. I ... personally sent messages to the plaintiff explaining that we do not serve meals with pork or beef products at all. Even though the plaintiff was never served meals with pork or beef products it was common for the plaintiff to send parts of his meal back complaining that the food contained pork or beef products. The meals served by the Houston County Jail to inmates as a regular part of their meals include chicken, fish and soy bean burgers, turkey ham, turkey sausage as well as other meat products made from turkey.

*Defendants' Exhibit 3/Affidavit of Carolyn Deloris Jackson - Court Doc. No. 14-4* at 2-3.

Wiley makes the conclusory allegation that the defendants failed to provide adequately for his dietary needs. He bases this claim on mere speculation that the meals served failed to contain "even 1800 calories a day...." *Plaintiff's Complaint - Court Doc. No. 1* at 3. The only probative evidence before the court refutes Wiley's specious allegation and demonstrates that Wiley received nutritionally adequate meals during his confinement in the Houston County Jail. In light of the foregoing, the court concludes that summary judgment is due to be granted in favor of the defendants on Wiley's claim challenging the adequacy of his diet.

## E. Medical Assistance

Wiley contends the defendants failed to provide him medical treatment for "his rapid physical deterioration" evidenced by a weight loss of ten pounds during his first thirty days of confinement in the Houston County Jail. *Plaintiff's Complaint - Court Doc. No. 1* at 3.

The defendants deny they acted with deliberate indifference to Wiley's physical condition and, instead, maintain they provided him with necessary and appropriate treatment.

To prevail on a constitutional claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that those responsible for providing the treatment acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986). Specifically, jail and medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292; *Mandel v. Doe*, 888 F.2d 783, 787 (11th Cir.1989). When seeking relief based on deliberate indifference of responsible officials, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he

must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference). Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, ... the Supreme Court has ... emphasized that not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.' *Estelle*, 429 U.S. at 105, 97 S.Ct. at 291; *Mandell,* 888 F.2d at 787. Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' *Rogers*, 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle*, 429 U.S. at 106, 97 S.Ct. at 292 ('Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.'); *Mandel*, 888 F.2d at 787-88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop*, 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop*, 871 F.2d at 1033 (citing *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir.1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991). Moreover, "whether government actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis

for liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir.

1995); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact inmate

desires a different mode of medical treatment does not amount to deliberate indifference

violative of the Constitution); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A

difference of opinion as to how a condition should be treated does not give rise to a

constitutional violation."); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981)

(medical personnel do not violate the Constitution simply because their opinions

concerning medical treatment conflict with that of the inmate-patient).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind."'" *Farmer,* 511 U.S. at 834-38, 114 S.Ct. at 1977-80; *Wilson v. Seiter,* 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991).... Even assuming the existence of a serious risk of harm and causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists--and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2001).  Thus, for Wiley to avoid

summary judgment on his deliberate indifference claim, he is "required to produce

sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate

indifference to that risk; and (3) causation."  *Hale v. Tallapoosa County*, 50 F.3d 1579,

1582 (11th Cir. 1995).

> No extended discussion of the facts is necessary.  The medical records filed herein

demonstrate that during Wiley's confinement in the Houston County Jail medical personnel, including defendant Speigner, routinely examined Wiley, addressed his complaints, evaluated his allegations regarding weight loss, dietary needs and fainting, ordered requested diets, and provided treatment in accordance with their professional judgment. *Defendants' Exhibit A to the Affidavit of Darla Jane Speigner/Inmate Medical Records of Michael Lewis Wiley - Court Doc. No. 14-13* at 1-24.

In her affidavit, defendant Speigner responds to the medical treatment issue presented by Wiley.

> In addition to funding four full time nurse positions (one of which is a Certified Registered Nurse Practitioner), a doctor contracted as the staff doctor and a registered supervising pharmacist for the provision of medical care to inmates such as the plaintiff, the County Jail provides a general medical clinic for medical problems that may arise in the jail. The medical clinic is held daily, Monday through Friday. The clinic is staffed by the staff physician and/or the Certified Registered Nurse Practitioner under the supervision of the physician. The nurses are in the Pods [or living areas of the jail] three (3) times each day passing out inmate medications as well. Thus, inmates are given daily access to nursing services, hospital emergency room services, if necessary, and the general medical clinic. In addition, the nurses who work at the jail carry southern linc radio telephones and alternate being "on call" so there is generally a nurse available "on call" to the jail on a 24 hour a day, seven days a week, basis.
>
> It is the policy of the Houston County Jail that all requests for medical treatment are forwarded to one of the nurses on duty with the expectation that appropriate and necessary medical treatment will be provided to or obtained for the inmate.
>
> The jail medical staff is committed to providing needed medical treatment to every inmate even when the inmate is manipulative, abusive or does not cooperate in his treatment. The jail medical staff makes medical decisions based on medical needs, not the desires of the inmate.

31

Based on my treatment to the plaintiff and my review of the plaintiff's jail medical file, the plaintiff was, during the period of time made the basis of Plaintiff's complaint, provided all necessary medical testing, treatment and care while in the Houston County Jail. At all times alleged in Plaintiff's Complaint, he has been given and provided adequate and necessary medical treatment and has at all times relevant thereto been provided with all medically necessary medications. While in the jail, the plaintiff has been seen almost every day by one or more of the nurses in the jail including myself as the Certified Registered Nurse Practitioner or by one of the other members of the jail medical staff.

When the plaintiff was [brought into] the Jail, the docket staff [went] over and fill[ed] out a form called the Houston County Jail Receiving Screening Form. On that form the plaintiff indicated that he had been prescribed a special diet by a physician and described the diet as "kosher food, veg diet." At the time the plaintiff was incarcerated in the jail on September 29, 2005, according to the information provided by the plaintiff himself, the jail records note that the plaintiff stated his height to be six foot one inch (6' 1") and that the inmate represented his weight to be approximately Two hundred and fifteen (215) pounds. The actual weighing of inmates does not take place until they are evaluated for the first time by the medical staff of the jail. On October 3, 2005, [four days after arrival at the jail,] the plaintiff was for the first time evaluated by the medical staff of the jail and a Houston County Jail Medical Clinic Intake form was completed with regard to the plaintiff. At that time the plaintiff's actual weight was taken by the medical personnel in the jail and the plaintiff's actual weight was found to be two hundred two (202) pounds. On November 15, 2005, [in response to a complaint by the plaintiff alleging inordinate weight loss,] the plaintiff was again weighed by the medical staff and was found to weigh two hundred (200) pounds. On December 21, 2005, after the plaintiff filed his lawsuit, but before his lawsuit was received by the defendants, the plaintiff was weighed by the medical staff and found to weigh one hundred ninety nine (199) pounds. On January 3, 2006, after the plaintiff's lawsuit was received by the jail staff, the jail medical staff tried to weigh the plaintiff and the plaintiff refused to have his weight taken.

In response to plaintiff's grievances regarding his food and weight claims, I ... reviewed the diet the plaintiff was provided and found it to be nutritional and also found his weight loss ... to be within normal limits and that the plaintiff was not underweight.

32

> In response to the plaintiff's claim of fainting and hitting his head, the medical staff at the jail at no time found any objective evidence to support such a claim. The plaintiff was at all times provided a nutritionally balanced diet and his request for a special diet was honored by the jail staff. It became apparent [to the staff], that the plaintiff wanted to arbitrarily control his diet each day and that is not allowed within the Houston County Jail....

*Defendants' Exhibit 5/Affidavit of Darla Jane Speigner - Court Doc. No. 14-12* at 2-4.

Under the circumstances of this case, it is clear that the course of treatment undertaken by the defendants was neither grossly incompetent nor inadequate. It is undisputed that the defendants evaluated Wiley's condition, addressed his complaints and provided treatment as dictated by his physical condition. Although Wiley asserts that medical personnel should have undertaken a different course of treatment, this assertion, without more, fails to establish deliberate indifference. *Hamm*, 774 F.2d at 1575; *Garvin*, 236 F.3d at 898; *Harris*, 941 F.2d at 1505; *Franklin*, 662 F.2d at 1344. Wiley presents no evidence which indicates the defendants knew that the manner in which the medical staff treated his condition created a substantial risk to his health and that with this knowledge consciously disregarded such risk. In sum, the record is devoid of evidence, significantly probative or otherwise, showing that any named defendant acted with deliberate indifference to Wiley's medical needs and the defendants are therefore entitled to entry of summary judgment.

### F. Remaining Claims for Relief

The remaining claims for relief address various conditions of confinement imposed

upon Wiley during his confinement in segregation at the Houston County Jail.  Specifically, Wiley alleges that during his confinement unidentified jail personnel (i) deprived him of the right to communicate with family and friends, (ii) subjected him to cruel and unusual punishment by denying him adequate exercise and removing his mattress for twelve hours each day, (iii) infringed on his right to practice his religion, and (iv) denied him access to the courts.  These claims are properly lodged only against the individual correctional officials named as defendants --Sheriff Lamar Glover, Commander William McCarty and corrections officer Pamela Miller -- as neither the jail's dietician nor nurse are in any way involved with the administration of segregation.

The law is well settled that defendants "can have no respondeat superior [or vicarious] liability for a section 1983 claim." *Marsh v. Butler County*, 268 F.3d 1014, 1035 (11th Cir. 2001); *Miller v. King*, 384 F.3d 1248, 1261 (11th Cir. 2004) ("[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir.2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir.1999), citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) (42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability.); *Cook ex*

*rel. Estate of Tessier v. Sheriff of Monroe County, Florida*, 402 F.3d 1092, 1115-1116 (11th Cir.2005) (In establishing liability under § 1983, a prisoner cannot rely on theories of vicarious liability or respondeat superior.). Thus, defendants Glover, McCarty and Miller are liable for challenged actions of other officers only if they "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions ... and the alleged constitutional deprivation." *Cotton v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (citation omitted).

Wiley does not allege that defendants Glover, McCarty or Miller personally participated in the actions taken against him while in segregation and the defendants deny any personal involvement with such actions. *Defendants' Exhibit 1/Affidavit of Lamar Glover - Court Doc. No. 14-2* at 1 ("With regard to Plaintiff's claims in this lawsuit, I was not personally or directly involved in the things and matters made the basis of Plaintiff's allegations...."); *Defendants' Exhibit 2/Affidavit of Pamela D. Miller - Court Doc. No. 14-3* at 2 ("[M]y interaction with the plaintiff has been limited to the time the plaintiff was booked into the jail and I was the corrections officer that was ordered to transport the plaintiff to segregation based on the plaintiff's refusal to comply with the jail[']s hygiene policy and submit to a hair cut."); *Defendants' Exhibit 4/Affidavit of William B. McCarty - Court Doc. No. 14-7* at 2. ("Even though I am actively involved in the daily administration of the jail, I was not actively, directly or personally involved in the allegations made by the

plaintiff in his complaint."). Thus, the evidence before the court demonstrates that these defendants did not personally participate in the alleged denials of Wiley's constitutional rights now under consideration.

Based on the foregoing, defendants Glover, McCarty and Miller may be held liable in this § 1983 action if their actions bear a causal relationship to the alleged violations of Wiley's constitutional rights. To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of these defendants, Wiley must present sufficient evidence of either "a history of widespread abuse [that] put[] [the defendants] on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so...." or "a ... custom or policy [that] result[ed] in deliberate indifference to constitutional rights, or ... facts [that] support an inference that [Glover and McCarty as supervisory officials] directed the subordinates to act unlawfully, or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted). A thorough review of the pleadings and evidentiary materials submitted in this case demonstrates that Wiley has failed to meet this burden.

1. <u>Causal Relationship Test</u>. The record before the court is devoid of evidence to support an inference that Glover, McCarty or Miller directed jail personnel to act unlawfully or knew that jail personnel would act unlawfully and failed to stop them from doing so. Wiley has likewise failed to show a history of widespread abuse at the Houston

County Jail which put any of the aforementioned defendants on notice of the alleged constitutional violations. Consequently, neither method of establishing liability under the causal relationship test provides a basis for liability under § 1983. The court will therefore address whether the customs or policies of the Houston County Jail resulted in violations of Wiley's constitutional rights.

    2. <u>Denial of Communication with Family and Friends</u>. Wiley complains that jail personnel denied him the right to communicate with family and friends. In support of this claim, Wiley alleges that officers routinely confiscated his writing instruments, denied him general visitation, refused to allow him use of a telephone for personal calls and provided only intermittent commissary privileges. The policies of the Houston County Jail allow inmates to maintain in their possession "2 legal pads ... 25 envelopes with stamps, 2 ... pencils [and] 2 pens (non-retractable, non-metal point, see-through) (no crayons, colored pencils, highlighters or markers allowed)." *Defendants' Exhibit A to the Initial Affidavit of William B. McCarty - Court Doc. No. 14-8* at 3. Additionally, all inmates are allowed to send and receive mail. *Defendants' Exhibit I to the Second Affidavit of William B. McCarty - Court Doc. No. 32-5* at 7-9. The jail likewise has policies allowing inmates telephone and visitation privileges. *Defendants' Exhibit A to the Initial Affidavit of William B. McCarty - Court Doc. No. 14-8* at 5-6. However, these privileges may be revoked for penological reasons and "inmates are not allowed [general] visitors while serving time [in

segregation]." *Id.* at 6; *Defendants' Exhibit 4/Initial Affidavit of William B. McCarty - Court Doc. No. 14-7* at 5 ("[B]ecause [Wiley] was in segregation until he complied with the jail's hygiene policy, the plaintiff was not permitted visitation privileges.").

Defendant McCarty advises that in accordance with the policies of the jail, "inmates in [segregation] are provided paper, pencil[s], and envelopes on a weekly basis. Inmates that do not have money in their account at the jail are also provided stamps by the jail, otherwise, the inmates are charged the face value of the postage provided to them.... Because of the plaintiff's continued refusal to comply with the jail's hygiene policy and allow his hair to be cut, the plaintiff was not allowed telephone or visitation privileges other than with his lawyer(s). Telephone calls from and visitation with lawyers are generally permitted at any time of the day except during meal times and even at night if requested by the attorney." *Defendants' Exhibit 4 - Initial Affidavit of William B. McCarty - Court Doc. No. 14-7* at 3-4. The record before the court likewise establishes that Wiley's commissary privileges were suspended on several occasions due to his repeated violations of the jail's rules governing inmate behavior. It is also undisputed that Wiley had access to paper, writing instruments and postage throughout his confinement in the Houston County Jail, as evidenced by his acknowledged filing of numerous internal appeals and inmate grievances and the documents submitted in this case.

Initially, with respect to Wiley's First Amendment claim, the law is well settled that

inmates do not have an absolute constitutional right to visitation or communication with free-world individuals. *Carballo-Sandoval v. Honstead*, 35 F.3d 521, 525 (11th Cir. 1994); *Evans v. Johnson*, 808 F.2d 1427, 1428 (11th Cir. 1987). These privileges are subject to the discretion of correctional personnel and may be limited and/or revoked in the furtherance of legitimate penological objectives. *McCray v. Sullivan*, 509 F.2d 1332, 1334 (5th Cir.), *cert. denied*, 423 U.S. 859, 96 S.Ct. 114 (1975); *Carballo-Sandoval*, 35 F.3d at 525 (policies may curtail communication privileges provided they meet legitimate penological objectives); *Evans*, 808 F.2d at 1428 (same). The policies and procedures of the Houston County Jail regarding mail, telephone use and visitation do not violate the First Amendment. Moreover, it is undisputed that any restriction placed on these privileges occurred due to the plaintiff's failure to abide by the rules and regulations of the Houston County Jail. Summary judgment is therefore due to be granted in favor of the defendants.

    3. <u>Removal of Mattress and Exercise Opportunities</u>. Wiley contends that jail officials subjected him to cruel and unusual punishment because officers removed the mattress from his cell for twelve hours each day. He also complains that the failure to provide access to the outdoors denied him adequate exercise. In response to these allegations, defendant McCarty asserts that inmates in segregation, except protective custody inmates, "have their mattresses and bedding taken from them at 7:00 a.m. each morning and it is returned to them at 7:00 p.m. each evening. At no time was the plaintiff

forced to sleep without his mattress at night."  *Defendants' Exhibit 4/Initial Affidavit of William B. McCarty - Court Doc. No. 14-7* at 3.  "With regard to plaintiff's claims related to denial of recreation, fresh air or sunlight, each day the plaintiff was provided ... the opportunity to take a shower, brush his teeth and exercise....  Because he was in segregation until he complied with the jail's hygiene policy, the plaintiff's activities were limited to his cell and to the day room area in the Pod where he was housed."  *Id*. at 5.  Wiley could exercise at any time within his cell and during his time in the day room.  *Defendants' Exhibit K to the Second Affidavit of William B. McCarty - Court Doc. No. 32-5* at 12.

Living conditions within a jail constitute cruel and unusual punishment when the conditions involve or result in "wanton and unnecessary infliction of pain, [or] ... [are] grossly disproportionate to the [reason for] imprisonment."  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  "Conditions ... alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities.  Such conditions could be cruel and unusual under the contemporary standard of decency....  But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional."  *Rhodes*, 452 U.S. at 347.  "[C]onduct that does not purport to be punishment at all [such as claims related to conditions of confinement] must involve more than ordinary lack of due care for the prisoner's interests or safety....  It is ***obduracy and wantonness, not inadvertence or error in good faith***, that characterize the conduct prohibited by the Cruel and Unusual

Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (emphasis added).

To determine whether conditions of confinement constitute cruel and unusual punishment, the court must look to the effect the condition has upon the inmate. *Rhodes*, 452 U.S. at 366. In a case involving conditions of confinement generally or several different conditions, the court should consider whether the claims together amount to conditions which fall below constitutional standards. *Hamm v. De Kalb County*, 774 F.2d 1567 (11th Cir. 1985), *cert. denied Hamm v. De Kalb County*, 475 U.S. 1096, 106 S.Ct. 1492, 89 L. Ed. 2d 894 (1986); *see also Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991). The court's consideration of whether the totality of the plaintiff's claims amount to conditions which fall below applicable constitutional standards is limited by the Supreme Court's admonishment that "*[s]ome* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need.... To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes. Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter*,

501 U.S. 294, 304-305 (1991) (emphasis in original).

Wiley fails to meet his burden on summary judgment of establishing that the policies of the Houston County Jail resulted in a denial of the minimal civilized measure of life's necessities or subjected him to a wanton and unnecessary infliction of pain. *Wilson*, 501 U.S. at 297; *Rhodes*, 452 U.S. at 347. Hence, summary judgment is due to be granted in favor of the defendants on these claims.

4. <u>Right to Practice Religion</u>. To the extent that Wiley presents a claim regarding a general denial of the right to practice his religion, he is likewise entitled to no relief. It is clear from the evidentiary materials submitted by the parties that Wiley could freely practice his religion while incarcerated in the Houston County Jail. The policies of the Houston County Jail allow clergy of all established religious faiths access to inmates. *Defendants' Exhibit A to the Initial Affidavit of William B. McCarty - Court Doc. No. 14-8* at 9. "Subject only to the usual security and safety measures, the Houston County Jail is and has always been open for clergy of all generally recognized faiths to come to the jail to hold religious services for inmates in the jail [or visit with inmates who request such visitation].... The plaintiff was at all times permitted to practice his religion in his cell during lock down times and in the open area of his Pod when he was there." *Defendants' Exhibit 4/Initial Affidavit of William B. McCarty - Court Doc. No. 14-7* at 4.

There is nothing before the court to indicate that any policy of the Houston County

Jail denied Wiley the right to practice his religion. *See Employment Div. v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); *Turner v. Safely*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). An inmate's free exercise right does not "depend upon his ability to pursue each and every aspect of the practice of his religion." *Canedy v. Boardman*, 91 F.3d 30, 33 (7th Cir. 1996). Furthermore, the record is devoid of evidence that jail personnel implemented the applicable policies to infringe upon Wiley's religious rights. *See, e.g., Sasnett v. Litscher,* 197 F.3d 290, 293 (7th Cir. 1999). Wiley has therefore failed to establish that the policies of the Houston County Jail resulted in a violation of the First Amendment and the motion for summary judgment with respect to this claim should be granted in favor of the defendants.

5. <u>Access to the Courts</u>. Wiley complains jail personnel denied him access to legal materials and refused him physical access to the law library in violation of his right of access to the courts. The policy of the Houston County Jail provides an inmate "access to the courts ... in a manner which will assist in the provision of the legal rights of the inmate.... Access of inmates to any court shall not be blocked, denied, delayed or otherwise obstructed by any member of the jail staff." *Defendants' Exhibit H to the Second Affidavit of William B. McCarty - Court Doc. No. 32-5* at 6. The rules/policies of the Houston County Jail further allow for inmate use of the facility's law library upon a requisite request by the inmate. *Defendants' Exhibit A to the Initial Affidavit of William B. McCarty - Court*

*Doc. No. 14-8* at 7. Inmates are likewise afforded access to their attorney(s) relatively unrestricted via telephone and visitation. *Defendants' Exhibit 4 - Initial Affidavit of William B. McCarty - Court Doc. No. 14-7* at 4 (Wiley was allowed telephone and visitation "privileges ... with his lawyers. Telephone calls from and visitation with lawyers are generally permitted at any time of the day except during meal times and even at night if requested by the attorney.").

The law directs that incarcerated persons are entitled to "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bounds v. Smith*, 430 U.S. 817, 825 (1977). In *Lewis v. Casey*, 518 U.S. 343 (1996), the Supreme Court clarified and limited the right to assistance set forth in *Bounds*. Specifically, the Court held that "an inmate alleging a violation of *Bounds* must show actual injury" arising from the alleged inadequacies in the law library, legal assistance program or access provided by officials. *Lewis*, 518 U.S. at 349. In identifying the particular right protected by *Bounds*, the Court explained that "*Bounds* established no ... right [to a law library or to legal assistance]. The right that *Bounds* acknowledged was the (already well-established) right of ***access to the courts***.... [P]rison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Id*. at 350-351 (emphasis in original) (citations

44

omitted).  The Court further opined  *Bounds* did not require "that the State ... enable the prisoner to ***discover grievances***, and to ***litigate effectively*** once in court....  To demand the conferral of such sophisticated legal capabilities upon a mostly uneducated and indeed largely illiterate prison population is [not something] ... the Constitution requires."  *Id*. at 354 (emphasis in original).

The Court similarly rejected the argument that the mere claim of a systemic defect, without a showing of actual injury, presented a claim sufficient to confer standing.  *Id*. at 349.  Moreover, *Lewis* emphasized that a *Bounds* violation is related to the lack of an inmate's capability to present claims.  518 U.S. at 356.  "*Bounds*, which as we have said guarantees no particular methodology but rather the conferral of a capability -- the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.  When any inmate ... shows that an actionable claim of this nature which he desired to bring has been lost or rejected, or that the presentation of such a claim is currently being prevented, because this capability of filing suit has not been provided, he demonstrates" the requisite actual injury.  *Lewis*, 518 U.S. at 356.  Finally, the Court discerned that the injury requirement is satisfied only when an inmate has been denied "a reasonably adequate opportunity to file nonfrivolous legal claims challenging [his] convictions or conditions of confinement....  [I]t is that capability, rather than the capability of turning pages in a law library, that is the touchstone."  *Id*. at 356-357.  "[T]he

Constitution does not require that prisoners ... be able to conduct generalized research, but only that they be able to present their grievances to the courts - a more limited capability that can be produced by a much more limited degree of legal assistance." *Id*. at 360. The Court admonished that federal courts should allow prison officials to determine the best method of ensuring that inmates are provided a reasonably adequate opportunity to present their nonfrivolous claims of constitutional violations to the courts. *Id*. at 356. A federal district court must "'scrupulously respect[] the limits on [its] role,' by 'not ... thrust[ing] itself into prison administration' and instead permitting '[p]rison administrators [to] exercis[e] wide discretion within the bounds of constitutional requirements.' [*Bounds*, 430] U.S. at 832-833, 97 S.Ct. at 1500." *Id*. at 363.

Wiley has failed to come forward with any evidence that the actions about which he complains deprived him of the ***capability*** of pursing claims in this or any other court. Throughout the proceedings in this case, Wiley has repeatedly demonstrated that he is both proficient and prolific at presenting and arguing a variety of claims to the court of his choice. Nothing before the court indicates that the actions about which Wiley complains improperly impeded or adversely affected his efforts to pursue nonfrivolous legal claims. Thus, there is no evidence that the relevant rules or policies of the Houston County Jail deprived Wiley of access to the courts. *Lewis*, 518 U.S. at 356. Summary judgment is therefore due to be granted in favor of the defendants on this claim. *Chandler v. Baird*, 926

F.2d 1057 (11th Cir. 1991).

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The claims against Houston County Jail Staff be dismissed.

2. The motion for summary judgment filed on behalf of the properly named defendants' be GRANTED.

3. Judgment be entered in favor of all defendants.

4. The costs of this proceeding be taxed against the plaintiff.

5. This case be dismissed with prejudice.

It is further

ORDERED that on or before September 16, 2008 the parties may file objections to this Recommendation. Any objections filed must clearly identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from

attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 3rd day of September, 2008.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

48